AO 106 (REV 04/10) Application for a Search Warrant

**FILED** TD

5/23/2023

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

AUSA Kristen Totten, (312) 353-5300
AUSA Jimmy L. Arce, (312) 353-5300

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

In the Matter of the Search of:

Case No. 23M548

The cellular telephone, further described in Attachment A-6

Ref. No. 19 GJ 1230

## APPLICATION AND AFFIDAVIT FOR A SEARCH WARRANT

I, Eric Luna, a Special Agent of the DEA, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property or premises:

### See Attachment A-6

located in the Northern District of Illinois, there is now concealed:

### See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is evidence.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Sections 841 and 846 | conspiracy to knowingly and intentionally possess with the intent to distribute and distribute narcotics, namely, five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II Controlled Substance |

The application is based on these facts:

### See Attached Affidavit,

Continued on the attached sheet.

ERIC LUNA

Digitally signed by ERIC LUNA
Date: 2023.05.23
10:47:55 -05'00'

_Applicant's Signature_

ERIC LUNA, Special Agent
Drug Enforcement Administration
_Printed name and title_

Pursuant to Fed. R. Crim. P. 4.1, this Application is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the statements in the Application and Affidavit by telephone.

Date: May 23, 2023    10:09am

_Judge's signature_

City and State: Chicago, Illinois

JEFFREY COLE, U.S. Magistrate Judge
_Printed name and title_

UNITED STATES DISTRICT COURT     )

                                            )

NORTHERN DISTRICT OF ILLINOIS    )

## AFFIDAVIT

I, Eric Luna, being duly sworn, state as follows:

1.     I am a Special Agent with the DEA. I have been so employed since approximately January 2018.

2.     As part of my duties as DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3.     I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4.     I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives,

"stash houses" (houses used as drug/money storage locations), storage facilities, bank safe deposit boxes, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

5.     This affidavit is made in support of an application for a warrant to search: (1) a silver Apple iPhone, bearing IMEI 35 565650 786359 5 ("**Subject Phone 1**"), (2) a silver Apple iPhone with a cracked screen, bearing IMEI 35 603784 569476 1 ("**Subject Phone 2**"), (3) a black Apple iPhone with a cracked screen, bearing IMEI 35 396710 755173 4 ("**Subject Phone 3**"), (4) a silver Apple iPhone, bearing IMEI 35 397910 198795 4 ("**Subject Phone 4**"), (5) a white Apple iPhone with a cracked screen, bearing 35 1889092 482936 8 ("**Subject Phone 5**"), and (6) a black Apple iPhone cellular telephone, bearing IMEI 35 675908 525327 7 ("**Subject Phone 6**") for evidence described further in Attachment B, concerning narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846.

6.     The statements in this affidavit are based on my personal knowledge, and on information I have received from other law enforcement personnel and from persons with knowledge regarding relevant facts. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts

that I believe are sufficient to establish probable cause to believe that evidence of violations of Title 21, United States Code, Sections 841 and 846, are located within **Subject Phone 1**.

## I. FACTS SUPPORTING PROBABLE CAUSE TO SEARCH THE SUBJECT PHONE

7.      As explained below, on May 17, 2023, law enforcement arrested EDUARDO BUENO, HERMAN RUIZ, and GARY ALTAMIRANO.  During the arrest law enforcement recovered a total of six cellular telephones (the "**Subject Phones**") as follows:

A.      Law enforcement recovered three cellular telephones from BUENO, who was holding the phones in his hands at the time of his arrest: (1) a silver Apple iPhone, bearing IMEI 35 565650 786359 5 ("**Subject Phone 1**"), (2) a silver Apple iPhone with a cracked screen, bearing IMEI 35 603784 569476 1 ("**Subject Phone 2**"), and (3) a black Apple iPhone with a cracked screen, bearing IMEI 35 396710 755173 4 ("**Subject Phone 3**").

B.      Law enforcement recovered two phones from RUIZ, who was holding the phones in his hands at the time of his arrest: (4) a silver Apple iPhone, bearing IMEI 35 397910 198795 4 ("**Subject Phone 4**"), and (5) a white Apple iPhone with a cracked screen, bearing 35 1889092 482936 8 ("**Subject Phone 5**").

C.      Finally, law enforcement recovered a cellular telephone – namely, a black Apple iPhone cellular telephone, bearing IMEI 35 675908 525327

3

7 ("**Subject Phone 6**"), during a consent search of a vehicle driven by ALTAMIRANO, which ALTAMIRANO stated had been provided to him by RUIZ and contained the address where ALTAMIRANO was to deliver 10 kilograms of cocaine to BUENO.

### A. CS-7 is Arrested with Three Kilograms of Cocaine he Obtained from BUENO

8.    On or about April 5, 2023, Illinois State Police conducted a traffic stop[1] of a Ford F250 truck, bearing Illinois registration[2] 158608C, at mile marker 9 of Interstate 88, driven by an individual who later agreed to cooperate with law enforcement, CS-7. During the stop, law enforcement deployed a narcotics-sniffing canine, who alerted positive to the presence of narcotics. Law enforcement then conducted a search of the vehicle and recovered approximately three kilograms of a white powdery substance that field-tested positive for cocaine.  Law enforcement placed CS-7 under arrest.[3]

---

[1] According to the Illinois State Police report, citations were issued for following too closely, inadequate splash guards, and improper window tint.

[2] According to Illinois Secretary of State Records, the vehicle was registered to CS-7.

[3] At the time of CS-7's arrest, CS-7 was not cooperating with the government and was in possession of a controlled substance. CS-7 is now cooperating with the DEA in hopes of receiving consideration in connection with any subsequent charging or sentencing decisions that will be made in CS-7's case.  CS-7 has nine prior felony arrests and four convictions. No promises have been made to CS-7. CS-7 has provided information in this case that has been corroborated through various investigative means to include physical surveillance, recorded audio calls, video calls made in the presence of law enforcement, cell phone records and utility information.

9. Following his/her arrest, CS-7 was provided with and waived his/her *Miranda* rights and agreed to speak with law enforcement. During the consensually recorded interview, CS-7 admitted that he/she had three kilograms of cocaine and explained that he/she planned to deliver the cocaine to an individual CS-7 knew as "Jet". CS-7 stated that CS-7 previously delivered approximately two kilograms of cocaine four or five times to Jet in Rock Island County, Illinois over the past six months.

10. According to CS-7, CS-7 obtained the cocaine from his/her source of supply, an individual he/she knew as "Lalo", later identified as EDUARDO BUENO.[4] CS-7 explained that he obtained between five and ten kilograms of cocaine every three to four months for the past two years, in exchange for $20,000 per kilogram. According to CS-7, during this time, BUENO told CS-7 that he wanted to sell more cocaine and offered to front CS-7 an additional ten kilograms per order, however, CS-7 has always declined.

11. According to CS-7, in order to arrange narcotics transactions with BUENO, CS-7 contacted BUENO via FaceTime at (847) 262-7660 ("Bueno Phone 1").[5]

---

[4] On or about April 5, 2023, law enforcement showed CS-7 an Illinois Driver License photograph of BUENO and CS-7 identified BUENO as the same person he knew as "Lalo". According to CS-7, and as explained in greater detail herein, when arranging narcotics transactions, CS-7 communicates with BUENO via FaceTime and when CS-7 obtains narcotics from BUENO, he does so in person.

[5] According to CS-7, he/she first met BUENO through a mutual friend. During that meeting, BUENO provided his Snapchat account information and told CS-7 to use Snapchat to communicate regarding business. Since that time, BUENO has changed his account approximately two to three times, each time providing CS-7 with the new account

When CS-7 arrived at the pre-determined location, there were usually two to three other individuals who met with BUENO at the same time. On at least one occasion, BUENO arrived at the pre-determined location with an individual CS-7 later identified as HERMAN RUIZ.[6] After all of the individuals arrived, the individuals paid BUENO and BUENO provided the individuals, including CS-7, with the cocaine.

12.     Following the interview, law enforcement drove CS-7 by a residence on the 400 block of Oltendorf Road in Streamwood, Illinois (the "Streamwood Residence") and CS-7 identified the residence as BUENO's. CS-7 told law enforcement that he previously purchased cocaine from BUENO at the Streamwood Residence and observed BUENO with what he believed to be at least approximately $225,000. CS-7 said that it had been approximately one year since he had met with BUENO at the Streamwood residence.

**B.     BUENO Agrees to Provide CS-7 with Ten Kilograms of Cocaine**

13.     On or about April 12, 2023, at approximately 4:38 p.m., at the direction of law enforcement, CS-7 placed a FaceTime call to Bueno Phone 1.[7] According to CS-7, BUENO agreed to provide CS-7 with 10 kilograms of cocaine.  CS-7 asked BUENO if BUENO would be ready to provide CS-7 with the 10 kilograms of cocaine the

---

information. Over time, BUENO eventually provided CS-7 with his phone numbers, including "Bueno Phone 1" and his Snapchat username, "lalo_m3018".

[6] Law enforcement showed CS-7 a driver license photograph of RUIZ and CS-7 identified RUIZ as an individual he believed to be BUENO's source of supply, who had arrived at prior narcotics transactions with CS-7.

[7] The call was consensually video-recorded, but due to a technical issue, the call was not audio-recorded.

following day. BUENO responded that his source of supply was not answering him. BUENO then advised CS-7 that BUENO was reaching out to the "guys" in the city to bring the cocaine in the morning.

14. At approximately 6:35 p.m., at the direction of law enforcement, CS-7 placed an unrecorded call to BUENO, who was using Bueno Phone 1. According to CS-7, BUENO stated that everything was looking good for the morning however BUENO's source of supply was checking to make sure that the ten kilograms of cocaine were ready to go.

15. At approximately 10:35 p.m., at the direction of law enforcement, CS-7 placed a FaceTime call to Bueno Phone 1.[8] According to CS-7, BUENO informed CS-7 that the kilograms of cocaine would be coming from the "guys" in the city and should be available by 8:30 a.m. the following day.

16. On April 13, 2023, at approximately 8:56 a.m., CS-7 placed a consensually recorded call to Bueno Phone 1.[9] During the call, CS-7 stated, "Hey what

---

[8] The call was consensually video-recorded, but due to a technical issue, the call was not audio-recorded.

[9] Certain recorded conversations have been summarized in this Affidavit. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded conversations—and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. At various points in this Affidavit, I have included in brackets my interpretation of words and phrases used during the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from confidential sources, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

was I gonna tell you is that bro, there's no way that if I pay you a little bit more [transportation fee], you can't bring it [10 kilograms of cocaine] to me?" BUENO responded, "I can ask." CS-7 explained, "Cause I've just been getting comfortable with not having to drive here bro I ain't gonna lie that takes a lot of weight…" BUENO responded, "I told them king[10], I've been trying to get ahold of this other n***** [other source of supply], see what he's talking about king." CS-7 continued, "Cause yea, cause I'm to figure it out cause I've got these dudes waiting. And I keep fucking like, these dudes in Rock Island, you know what I mean, they want like three of them [3 kilograms of cocaine] bro and I keep telling them, you know what I mean, hold off, hold off." BUENO responded, "Let me go try to get ahold of this n**** king. And then uh, uh, I'll call you in a bit king." CS-7 replied, "Alright, that's cool. Just let me know." BUENO stated, "This n**** fucking, yea cause I guess they don't want to drive all the way over there king. You know what I'm saying? Like I said, she doesn't know around that way…She know like, she knows her way around like, not like all the way in Aurora, she knows, she knows a little bit in Aurora and in the E-Town [Elgin] and the city [Chicago] king, you feel me?"

17.     At approximately 3:09 p.m., CS-7 received an incoming Snapchat message from BUENO, utilizing Snapchat handle "lalo_m3018", where BUENO

---

[10] Based on my training and experience, searches of law enforcement databases, and discussions with law enforcement, I believe BUENO uses the term 'king' as a reference to the street gang Latin Kings, as both BUENO and CS-7 are members of the Latin Kings.

provided CS-7 with an address of "351 waverly Ct Elgin" (the "Waverly Residence").[11] BUENO further advised that he was figuring out what time the 10 kilograms of cocaine would be at the Waverly Residence and stated that he would contact CS-7 in about an hour with a confirmation.

18.     At approximately 5:50 p.m., CS-7 received an incoming unrecorded FaceTime call from BUENO, who was using Bueno Phone 1. According to CS-7, BUENO explained to CS-7 that BUENO initially provided a location in Dekalb, Illinois to a female who would transport the cocaine from Chicago, however, the female did not want to travel so far with the cocaine. Therefore, BUENO told the female to travel instead to his brother's house in Elgin, Illinois, the Subject Premises. BUENO then told CS-7 to meet at BUENO's brother's residence.

19.     At approximately 7:25 p.m., law enforcement officers conducted surveillance on the Waverly Residence and observed BUENO walking through the front yard from the residence with a child. BUENO walked into the street as the child was running around. There were also several vehicles at the residence, including a black, Chevrolet Silverado pick-up truck, bearing Illinois registration 16196WS.[12]

---

[11] CS-7 provided a screenshot of the Snapchat message.

[12] According to Illinois Secretary of State records, the vehicle was registered to "Corina's Landscaping" at the Waverly Residence. Law enforcement determined that BUENO is also associated with Corina's Landscaping because, according to Illinois Secretary of State records, BUENO and Corinas Enterprises are the registered owners of a red Chevrolet pick-up truck bearing Illinois registration 167973C with an address of the Streamwood residence.

20.     On or about April 16, 2023, at approximately 11:25 p.m., CS-7 received an incoming phone call from BUENO from a new number, (331) 243-4373 ("**Subject Phone 1**"). BUENO advised CS-7 that he obtained new phone number, (331) 243-4373.

21.     Between April 16, 2023, and May 12, 2023, at the direction of law enforcement, CS-7 maintained contact with BUENO through Snapchat and phone communication.  CS-7 and BUENO continued to negotiate the purchase of at least ten kilograms of cocaine at a future date.

22.     On or about May 12, 2023, at approximately 9:16 p.m., CS-7 placed a consensually audio-recorded FaceTime call in the presence of law enforcement to BUENO, who was using **Subject Phone 1**.[13] During the conversation, CS-7 stated, "So I was gonna ask you bro, when the fuck is uh, when the fuck is you thinking about [conducting the narcotics transaction], you know.  Because I'm just trying to think ahead of time.  So I can have all the bread [money]…." BUENO responded, "I, I, I, I just [U/I].. we were over there and shit but.. dude from up there, got'em king. But this dude, that's the thing is that supposedly this n**** is only wants to do to do like five [five kilograms of cocaine] at a time king. But I told him, my boy not gonna want to be doing no fucking… you know what I'm saying."

---

[13] Because FaceTime is a calling feature available only on Apple products, it is believed that Bueno Phones 1 and 2 are Apple iPhones.

10

23.     Later in the conversation, CS-7 asked, "That he can only get five [kilograms of cocaine] at a time?" BUENO responded, "No, he's got them all king. He's got them all but I guess he just doesn't want to bring all of them at one time, know what I'm saying? I gonna tell you? Yea king, but uh, the numbers went up like 250 up [the price of a kilogram of cocaine went up by $250] king." CS-7 replied, "Well, two hundred and fifty? I don't give a fuck about that bro…Well you think we'll be able to do it, cause what, Sunday is Mother's Day.  Monday I gotta work.  You think we'll be able to do it like Tuesday or Wednesday?"  BUENO responded, "Yea king, unless, I mean I gotta put the message in right now.  Unless, unless you do it Sunday like early, early. You know what I'm saying?" CS-7 stated, "That's not gonna work bro cause I gotta fucking...we are gonna go to my mother-in-law's crib.  I don't even want to do that on Sunday because of my girl bro.  She's gonna freak the fuck out." BUENO replied, "Yea, no, that's cool man, like I said Monday or Tuesday king.  I mean fuck it I gotta take the day off.  I mean early Tuesday." CS-7 stated, "If we do it Tuesday we could do it early as hell too so you don't gotta take the day off.  And we could just do it early." BUENO responded, "Yea um, let me start making some phone calls king. Get this shit, let me try and get this shit situated." CS-7 stated, "Bet, cause like yea, I'm just trying to, man I was hoping to grab that fifteen [15 kilograms of cocaine] but if fucking…" BUENO assured, "Nah, nah, nah, he's got them king. He's got all of them if you want it king. Even when, when I told him, 'Man, you know, try to keep them at the same number.'  He was like, 'Bro', he was like, 'Bro, if you don't take them, the

next n**** take them.'" CS-7 responded, "Right, well I want them bro. I want them. I'm just trying to figure out [collect the money to purchase the cocaine]." BUENO stated, "Let me make this, uh, let me make this phone call king and I'll hit you up in a bit. Alright?"

24.    On or about May 13, 2023, at approximately 10:00 a.m., CS-7 received an unrecorded FaceTime call from BUENO, who was using **Subject Phone 1**. According to CS-7, BUENO confirmed that BUENO could meet CS-7 on Tuesday, May 16, 2023, to conduct the narcotics transaction. BUENO told CS-7 to go to BUENO's brother's house to get the kilograms of cocaine[14]. CS-7 asked if BUENO meant the Waverly Residence, to which BUENO replied yes. BUENO informed CS-7 that the price would be $20,250 and that BUENO should have all fifteen kilograms of cocaine at the Waverly Residence.  However, if BUENO was unable to get all fifteen, he would at least have ten kilograms of cocaine.

25.    On or about May 15, 2023, at approximately 2:36 p.m., CS-7 had a consensually audio-recorded FaceTime phone call with BUENO, in the presence of law enforcement, who was using **Subject Phone 1**. During the call, CS-7 asked, "But hey, you figure anything out yet or what [the details of the cocaine transaction]?" BUENO responded, "Tomorrow." CS-7 confirmed, "Yea?" BUENO responded, "You're

---

[14] BUENO did not use the words "kilograms of cocaine", however, based on prior dealing with BUENO, prior recorded conversations in which BUENO and CS-7 discussed arranging a narcotics transaction, and the seizure of approximately three kilograms of cocaine from CS-7 that CS-7 obtained from BUENO, CS-7 and law enforcement understood BUENO to be referring to kilograms of cocaine.

gonna have to come over here [the Waverly Residence]." CS-7 asked, "What time?" BUENO responded, "I'm gonna try, I'm gonna try for early king." CS-7 asked, "How early? What time you?" BUENO responded, "I'm trying to figure out the time right now."

26.     Later in the conversation, CS-7 stated, "Like what time are you thinking? Like 5:30 or 6 [in the morning]?" BUENO responded, "I'm gonna try, I'm gonna ask right now king. I'm gonna let you know right now." CS-7 asked, "And then what, and then, and then what?" BUENO responded, "Sawbuck [coded language for ten kilograms of cocaine]…Yea, for now. And then, and then, and then if you want it in a couple of days, the other, the other ones king [additional five kilograms of cocaine], they could probably push off those of to you. You know what I'm saying?" CS-7 responded, "That's cool I guess. It is what it is. I ain't tripping." BUENO replied, "Yea king so, so, I told him.. I need, I need quality you know? We ain't got no shit. Don't waste no time." CS-7 later confirmed, "And back, and what. It's gonna be in the, in the 'E' [coded language for Elgin, Illinois] or what?" BUENO responded, "Yea. You still got the thing right there [address for the Waverly Residence saved] right?" CS-7 responded, "I don't know, I gotta see if I've got it saved. I don't know." BUENO stated, "Yea, well if not, I'll send it to you again."

27.     On or about May 15, 2023, at approximately 10:10 p.m., at the direction of law enforcement, CS-7 placed an outgoing, unrecorded FaceTime call to BUENO, who was using **Subject Phone 1**. According to CS-7, BUENO advised CS-7 that his

13

source of supply works the 2nd shift (approximately 2:00 p.m. to 10 :00 p.m.) and is unable to come tomorrow afternoon. Both BUENO and CS-7 agreed to meet early Wednesday morning, May 17, 2023, in order to conduct the narcotics transaction. CS-7 confirmed the meeting location of the Waverly Residence.

### C. Law Enforcement Recovers Ten Kilograms of Suspected Cocaine

28.     On or about May 16, 2023, law enforcement obtained a warrant to search the Waverly Residence. (23 M 526, Jantz, MJ.)

29.     On or about May 17, 2023, at approximately 5:46 a.m., law enforcement officers on aerial surveillance observed a white sedan, later identified as a white Chevrolet, bearing Illinois registration EA23314[15], being driven by a male later identified to be RUIZ,[16] who was wearing a green vest, pull into the driveway of the Streamwood Residence. Approximately a minute later, law enforcement observed a heavy-set male Hispanic exit the residence wearing an orange t-shirt and black jean

---

[15] Law enforcement officers on aerial surveillance were unable to observe the type of vehicle or the license plate, however, law enforcement officers on ground surveillance later observed the vehicle and identified the vehicle as a white Chevrolet sedan bearing Illinois registration EA23314. According to Illinois Secretary of State records, the white Chevrolet sedan was registered to a female individual on the 1000 block of Grove Street in Aurora, Illinois. As described in more detail herein, this individual is a relative of ALTAMARINO with whom ALTAMARINO resides at the address on the white Chevrolet sedan's registration.

[16] As described in greater detail herein, law enforcement executed a search warrant on the Waverly Residence and observed and individual in the driver's seat who was wearing a green vest. When law enforcement approached the driver, he identified himself as RUIZ. Additionally, law enforcement reviewed an Illinois issued driver's license image for RUIZ and identified the driver as the same person.

shorts, later identified as BUENO.[17]  BUENO entered the front passenger seat of the white sedan and sat down.  The white sedan departed the driveway, followed by aerial surveillance.

30.     At approximately 5:52 a.m., CS-7, in the presence of law enforcement, received an incoming Snapchat voice memo from BUENO, who was using Snapchat username "lalo_m3018".[18]  During the voice memo, BUENO instructed the CS-7 to pull up behind BUENO's work truck once CS-7 arrived at the Waverly Residence and that BUENO and another individual would put the "ten" [ten kilograms of cocaine] in CS-7's trailer.[19] BUENO also advised CS-7 that BUENO observed the kilograms of cocaine the day before and the kilograms were of good quality.[20]

31.     At approximately 5:33 a.m., CS-7, in the presence of law enforcement, sent BUENO, who using Snapchat moniker of "Lalo_m3018", an unrecorded Snapchat voice memo stating that he/she should be at the Waverly Residence at 6:15 a.m.

---

[17] As described in greater detail herein, law enforcement executed a search warrant on the Waverly Residence and observed BUENO, who was wearing an orange t-shirt and black jeans, as the passenger in the white Chevrolet sedan. Prior to the execution of the search warrant, law enforcement officers observed an Illinois driver license photo of BUENO, and thus, were able to recognize BUENO in the vehicle.

[18] CS-7 was unable to record the voice memo and upon listening to the voice memo, the voice memo disappeared as a function of the SnapChat application.

[19] CS-7 owns and had a trailer.

[20] BUENO did not use the word "kilogram" or "cocaine", however, based on prior dealing with BUENO, prior recorded conversations in which BUENO and CS-7 discussed arranging a narcotics transaction, and the seizure of approximately three kilograms of cocaine from CS-7 that CS-7 obtained from BUENO, CS-7 and law enforcement understood BUENO to be referring to kilograms and cocaine.

15

32.     At approximately 5:57 a.m., law enforcement on ground surveillance observed a white Chevrolet sedan parked on the street near the driveway of the Waverly Residence.  Law enforcement observed RUIZ seated in the driver's seat and BUENO seated in the passenger seat.  Both RUIZ and BUENO remained in the parked vehicle with the vehicle on.

33.     At approximately 6:03 a.m., CS-7, in the presence of law enforcement, received an incoming Snapchat voice memo from BUENO, using Snapchat username "lalo_m3018."[21]  During the voice memo, BUENO told CS-7 that BUENO was at the Waverly Residence and that "buddy" [source of supply] was there too.  BUENO stated that BUENO and "buddy" were ready [to conduct the narcotics transaction].

34.     At approximately 6:04 a.m., CS-7, in the presence of law enforcement, sent BUENO, who was using Snapchat username of "Lalo_m3018", an unrecorded Snapchat voice memo stating that he/she would arrive in approximately 15 minutes.

35.     At approximately 6:15 a.m., law enforcement aerial surveillance observed a gray SUV parked on the street near the Waverly residence and directly behind a Chevrolet Silverado bearing Illinois registration 167973C, which had an attached trailer.[22]

---

[21] CS-7 was unable to record the voice memo and upon listening to the voice memo, the voice memo disappeared as a function of the Snapchat application.

[22] According to Illinois Secretary of State records, the Chevrolet Silverado was registered to BUENO.

36.    At approximately 6:25 a.m., law enforcement executed the search warrant for the Waverly Residence.  During the execution of the search warrant, law enforcement approached BUENO and RUIZ who were seated in the white Chevrolet sedan.  Law enforcement identified themselves as police asked BUENO and RUIZ to exit the vehicle.  BUENO and RUIZ did not comply.  Law enforcement then removed BUENO and RUIZ from the white Chevrolet sedan and detained them.  At the time of his arrest, BUENO was holding **Subject Phone 1**[23], **2**, and **3**, in his hand and RUIZ was holding **Subject Phone 4** and **5** in his hand.  Law enforcement seized **Subject Phones 1-5**.  Additionally, law enforcement approached ALTAMIRANO, who was near a gray Chevrolet Equinox.  Law enforcement identified themselves as police and told ALTAMIRANO to lay on the ground.  Law enforcement then detained ALTAMIRANO.

37.    At approximately 9:07 a.m., Kane County Sheriff's Office K9 Deputy L. Weston and K9 partner "Hudson", conducted a free air sniff on the Chevrolet SUV.  K9 Deputy Weston stated that on the first pass with K9 Hudson, Hudson displayed altered behavior near the rear passenger seat.  During the second pass of the Chevrolet SUV, K9 Deputy stated that K9 Hudson positively alerted to the possible presence of narcotics near the rear passenger side seat.  K9 Hudson graduated the Kane County Sheriff's Office K9 Academy in October of 2020.  K9

---

[23] On or about May 23, 2023, law enforcement officers placed a call to (331) 243-4373 and **Subject Phone 1** rang.

Hudson is trained in the detection of narcotics including marijuana, cocaine, heroin, and crystal methamphetamine.

38.     At approximately 9:50 a.m., law enforcement towed the Chevrolet SUV to the Elgin Police Department.

39.     At approximately 9:55 a.m., law enforcement transported BUENO, RUIZ, and ALTAMIRANO to the Elgin Police Department.

40.     At approximately 10:13 a.m., law enforcement advised ALTAMIRANO of and waived his *Miranda* warnings, which ALTAMIRANO waived both verbally and in writing.  Law enforcement then conducted an audio and video recorded interview of ALTAMIRANO.  During the interview, ALTAMIRANO stated that he and RUIZ spoke via phone on the night of May 16, 2023.  ALTAMIRANO stated that RUIZ was asking him for a favor.  Based on past experience, ALTAMIRANO understood this favor to mean that he would either pick up bulk currency or he would drive narcotics at the direction of RUIZ.  ALTAMIRANO drove his female relative's white Chevrolet sedan[24] to meet with RUIZ at a townhome located on the 2180 block of Oakbrook Circle in Palatine, Illinois[25] earlier in the morning.  ALTAMIRANO stated that RUIZ handed him a green cardboard box containing what he believed to be an unknown

---

[24] On or about May 17, 2023, at approximately 2:30 p.m., law enforcement made contact with the registered owner of the white Chevrolet sedan.  The owner confirmed that she was a relative of ALTAMIRANO, that they lived in the same house, and that she believed that ALTAMIRANO took her white Chevrolet sedan that morning.

[25] Law enforcement provided ALTAMIRANO with a satellite imagery of the townhomes in this area, but ALTAMIRANO was unable to specify the specific townhome where he had met RUIZ because the townhomes are all similar in appearance.

amount of cocaine. RUIZ instructed ALTAMIRANO to place the cardboard box into a gray Chevrolet SUV, bearing Illinois registration BD86228[26]. RUIZ then handed **Subject Phone 6** to ALTAMIRANO and advised ALTAMIRANO to follow the directions on the map application on that phone. RUIZ offered to provide ALTAMIRANO with $800 to transport the cocaine to the address on **Subject Phone6** and that RUIZ would meet ALTAMIRANO at the address provided in **Subject Phone 6**. ALTAMIRANO eventually arrived at the Waverly Residence and parked on the street. While there, he observed RUIZ in the driver's seat of ALTAMARINO's female relative's white Chevrolet sedan.

41. During the interview, law enforcement asked for and ALTAMIRANO provided video and audio recorded oral and written consent to search the Chevrolet SUV. Law enforcement then conducted a search of the Chevrolet SUV and recovered approximately ten kilograms of suspected cocaine located inside a cardboard "Makita" box located in the rear passenger seat, which presumptively field-tested positive for the presence of cocaine. Law enforcement also recovered **Subject Phone 6**.

42. Since May 17, 2023, the above-described **Subject Phones** have been in the government's custody.

---

[26] According to Illinois Secretary of State records, the vehicle was registered to a male individual with the last name "Ruiz" at an apartment located on the 1900 block of North Hicks Road in Palatine, Illinois. Based on a search of law enforcement databases, the individual may be a relative of RUIZ.

43.     Following the seizure of the **Subject Phones**, law enforcement reviewed the toll records for **Subject Phone 1** and **4**.  According to the toll records for **Subject Phone 1**, between April 15, 2023, and May 16, 2023, there were approximately 169 calls between **Subject Phone 1** and telephone number (224) 578-5515, with the last communication on or about May 16, 2023, at approximately 7:46 p.m.  On or about May 23, 2023, law enforcement called telephone number (224) 578-5515 and **Subject Phone 4** rang.  According to toll records for **Subject Phone 4**, there were approximately eight calls and one text message between ALTAMIRANO[27] and RUIZ, with the last contact on May 16, 2023 at approximately 9:03 p.m.

44.     At the time of search, data stored on the **Subject Phone**, including text and voice mail messages sent and received by the defendants during the course of the commission of the narcotics offenses, were not known.

45.     Based upon my training and experience, I know that cellular phones may contain relevant evidence of the narcotics offenses, including text messages made or received from the **Subject Phones** that are located in the memory of the **Subject Phones**, which messages may provide information regarding the identities of, and the methods and means of operation and communication used by, the participants in the narcotics offenses. Moreover, digital photographs located in the memory of the **Subject Phones** may contain images of the tools or participants

---

[27] During his post-arrest interview, ALTAMIRANO provided the number he used to communicate with RUIZ.

involved in the narcotics offenses. Moreover, digital photographs stored in the **Subject Phones** may contain images of the user of the **Subject Phones**, the user's associates (including persons involved in or knowledgeable about the subject offenses), places frequented by the user of the phone leading up to and during the subject offenses, and locations and instrumentalities used in committing the subject offenses.

46.     In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use, and events relating to the crime under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

47. Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

48. Through experience as a law enforcement officer and through the experience of other law enforcement officers as conveyed to me, I have learned that individuals involved in criminal offenses, including conspiracies to possess and distribute narcotics, commonly use cellular telephones as a means to communicate. For example, in this case BUENO used an Apple iPhone to Facetime with CS-7 and utilized a cellular telephone equipped with the Snapchat application to send message and voice memos to CS-7. In addition, according to ALTAMIRANO, RUIZ contacted ALTAMIRANO via phone to ask ALTAMIRANO to meet about transporting narcotics. RUIZ also provided ALTAMIRANO with a cellular telephone that

contained the address to the meeting location in order for ALTAMIRANO to deliver narcotics to BUENO. Individuals involved in criminal offenses including conspiracies to possess and distribute narcotics, also often store telephone numbers and names or nicknames of fellow conspirators on their telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Because, as explained above, the **Subject Phones** are associated with the targets in this case, and because, in my experience and in the experience of other agents, defendants use telephones to contact co-conspirators, there is probable cause to believe the **Subject Phones**, described further in Attachments A-1, A-2, A-3, A-4, A-5, and A-6, contain evidence of violations of narcotics.

## II. SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

49. Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a. Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b. Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

c. In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any

24

applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

        d.     In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

## III.    PROCEDURES TO BE FOLLOWED IN SEARCHING ELECTRONIC STORAGE MEDIA

    50.    Pursuant to Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, this warrant will authorize the removal of electronic storage media and copying of electronically stored information found in the premises described in Attachment A so that they may be reviewed in a secure environment for information consistent with the warrant. That review shall be conducted pursuant to the following protocol.

    51.    The review of electronically stored information and electronic storage media removed from the premises described in Attachment A may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein):

        a.     examination of all the data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      surveying file directories and the individual files they contain to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d.      opening or reading portions of files, and performing key word searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B.

52.    The government will return any electronic storage media removed from the premises described in Attachment A within 30 days of the removal unless, pursuant to Rule 41(c)(2) or (3) of the Federal Rules of Criminal Procedure, the removed electronic storage media contains contraband or constitutes an instrumentality of crime, or unless otherwise ordered by the Court.

## IV. CONCLUSION

53.    Based on the above information, I respectfully submit that there is probable cause to believe that narcotics offenses, in violation of Title 21, United States Code, Sections 841 and 846, have been committed, and that evidence relating to this criminal conduct, as further described in Attachment B, will be found in the Subject Phone, as further described in Attachment A.I therefore respectfully request that this Court issue a search warrant for the **Subject Phones** more particularly described in Attachment A-1, A-2, A-3, A-4, A-5, and A-6, authorizing the seizure of the items described in Attachment B, pursuant to the protocol described in the addendum to Attachment B.

FURTHER AFFIANT SAYETH NOT.

ERIC
LUNA

Digitally signed by
ERIC LUNA
Date: 2023.05.23
10:51:31 -05'00'

Eric Luna
Special Agent
DEA

Sworn to and affirmed by telephone 23rd day of May, 2023

Honorable JEFFREY COLE
United States Magistrate Judge

27

## ATTACHMENT A-6

### DESCRIPTION OF ITEM TO BE SEARCHED

The black Apple iPhone cellular telephone, bearing IMEI 35 675908 525327 7 ("**Subject Phone 6**").

## <u>ATTACHMENT B</u>

## LIST OF ITEMS TO BE SEIZED

Evidence concerning violation of Title 21, United States Code, Sections 841 and 846, as follows:

1. Communications and messages (including text messages, emails, instant messages, voicemail) concerning involvement in narcotics trafficking including information regarding location before, during, and after narcotics transactions, and the identities of any others involved in the narcotics conspiracy;

2. Information tending to identify the names, aliases, nicknames, telephone numbers, email addresses and other contact information concerning others engaged in narcotics trafficking;

3. Information concerning telephone calls between and among those involved in narcotics trafficking;

4. Electronic or digital images such as photographs and videos concerning involvement in narcotics trafficking;

5. Data which tends to identify the user of the **Subject Phone** (including any SIM cards within the phone that tends to identify the cellular telephone service provider associated with the **Subject Phone**); and

6. GPS location information pertaining to the location of the **Subject Phone** immediately prior to, during, and after narcotics transactions.

## ADDENDUM TO ATTACHMENT B

The government's review of electronic storage media, including cell phones, already in its possession shall be conducted pursuant to the following protocol:

The government must make reasonable efforts to use methods and procedures that will locate those categories of data, files, documents, or other electronically stored information that are identified in the warrant, while minimizing exposure or examination of categories that will not reveal the items to be seized in Attachment B.

The review of electronically stored information and electronic storage media described in Attachment A may include the below techniques. These techniques are a non-exclusive list, and the government may use other procedures if those procedures are designed to minimize the review of information not within the list of items to be seized as set forth in Attachment B:

a. examination of categories of data contained in such computer hardware, computer software, and/or memory storage devices to determine whether that data falls within the items to be seized as set forth in Attachment B;

b. searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth in Attachment B;

c. surveying various file directories and folders to determine whether they include data falling within the list of items to be seized as set forth in Attachment B;

d. opening or reading portions of files, and performing key word or concept searches of files, in order to determine whether their contents fall within the items to be seized as set forth in Attachment B; and

e. using forensic tools to locate data falling within the list of items to be seized as set forth in Attachment B.

Law enforcement personnel are not authorized to conduct additional searches for any information beyond the scope of the items to be seized by this warrant as set forth in Attachment B. To the extent that evidence of crimes not within the scope of this warrant appears in plain view during the government's review, the government shall submit a new search warrant application seeking authority to expand the scope of the search prior to searching portions of that data or other item that is not within the scope of the warrant. However, the government may continue its search of that same data or other item if it also contains evidence of crimes within the scope of this warrant.